Pamela A. COUDEN; Tiffany A. Couden, Adam R. Couden, a minor, buy his next friend, Pamela A. Couden; Nicholas M. Couden, a minor, by his next friend, Pamela A. Couden; Jordan T. Couden, a minor, by his next friend, Pamela A. Couden; Luke J. Couden, a minor by his next friend, Pamela A. Couden; and Micah J. Couden, a minor by his next friend, Pamela A. Couden, Plaintiffs,

v.

Scott DUFFEY; James C. Armstrong; Jay Freebery; Liam Sullivan, Two Unknown Named Agents of the Federal Bureau of Investigation; the New Castle County and the New Castle County Department of Police; the City of Wilmington, and the City of Wilmington Department of Police, Defendants.

No. CIV.A. 03–369–KAJ.

United States District Court, D. Delaware.

Feb. 18, 2004.

William D. Fletcher, Jr., Schmittinger & Rodriguez, P.A., Dover, DE, Counsel for Plaintiff.

Rudolph Contreras, Asst. United States Attorney, Wilmington, DE, Counsel for Defendant, Scott Duffy.

Michelle D. Allen, Asst. County Attorney, New Castle County, New Castle, DE, Counsel for Defendants James C. Armstrong and Jay Freebery.

Rosamaria Tassone, City of Wilmington Law Department, Wilmington, DE, Counsel for Defendants Liam Sullivan, New Castle County, New Castle County Department of Police; City of Wilmington, and City of Wilmington Department of Police.

## MEMORANDUM OPINION

JORDAN, District Judge.

## I. Introduction

This is a civil rights and tort action brought by Pamela A. Couden ("Plain-

tiff") and six of her children [1] against Defendants Scott Duffey ("Special Agent Duffey"), James C. Armstrong ("Officer Armstrong"), Jay Freebery ("Officer Freebery"), Liam Sullivan ("Officer Sullivan"), New Castle County, the New Castle County Department of Police ("NCCPD"), the City of Wilmington, the City of Wilmington Department of Police ("WPD"), two unknown agents of the Federal Bureau of Investigation,[2] and the United States of America. Presently before me are three motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (the "Motions"). The first is filed by Special Agent Duffey (D.I.32). The second is filed by Officer Armstrong, Officer Freebery, New Castle County, and the NCCPD (D.I.34).[3] The third is filed by the United States of America. (D.I.64.) The motions filed by Special Agent Duffey and by Officers Armstrong and Freebery, New Castle County, and the NCCPD also seek, in the alternative, summary judgment pursuant to Fed. R.Civ.P. 56. (*See* D.I. 32; D.I. 34). Also before me is Plaintiff's Motion for Relief under Fed.R.Civ.P. 56(f) (D.I. 48; the

"56(f) Motion"). Jurisdiction over this case is proper pursuant to 28 U.S.C. §§ 1331 and 1367. For the reasons that follow, the Motions filed by the Defendants [4] and the United States are granted and Plaintiffs' 56(f) Motion is denied.

## II. Background [5]

On April 12, 2001 at approximately 8:00 p.m., a Delaware Joint Violent Crime Fugitive Task Force ("Task Force") set up surveillance in the area of 7 Sanford Drive in Newark, Delaware in an effort to apprehend a fugitive wanted by the NCCPD for failure to appear for trial on various charges. (D.I. 32 at 4–5; D.I. 34 at 3.) The Task Force consisted of Special Agent Duffey from the Federal Bureau of Investigation ("FBI"), Officer Sullivan from the WPD, and Officers Armstrong and Freebery, both from the NCCPD. (D.I 32 at 5; D.I. 34 at 3.) Officers Armstrong and Freebery were parked in an unmarked surveillance vehicle alongside 3 Sanford Drive, which is Plaintiff's residence, and Special Agent Duffey and Officer Sullivan were parked in a second unmarked surveil-

1. The children, Tiffany A. Couden, Adam R. Couden, Nicholas M. Couden, Jordan T. Couden, Luke J. Couden, and Micah J. Couden, are also plaintiffs in this case. For ease of expression, this decision will refer to Ms. Pamela Couden as "Plaintiff," but the analysis is applicable to and binding on all the plaintiffs.

2. In the original Complaint, Plaintiff brought suit against Special Agent Duffey and "Six Unknown Named Agents of the Federal Bureau of Investigation." (D.I.1.) On July 3, 2003 the United States Attorney's Office identified Officers Armstrong, Freebery, and Sullivan as the officers who participated in the events at issue. (D.I. 48 at Ex. G.) Plaintiff amended her Complaint on July 24, 2003 to name these three officers, as well as New Castle County, the NCCPD, the City of Wilmington, the WPD, and "two unknown named agents" of the FBI. (D.I.24.) On November 6, 2003, Plaintiff amended her Com-

plaint a second time to include the United States of America as a defendant. (D.I.48.)

3. Officer Sullivan, the City of Wilmington, and the WPD answered the Complaint (D.I.33) and have not made any dispositive motions.

4. The term "Defendants" refers to Special Agent Duffey, Officer Armstrong, Officer Freebery, New Castle County, and the NCCPD. This term does not include the United States of America, the City of Wilmington, the WPD, or Officer Sullivan.

5. The following narrative does not constitute findings of fact, many of which are in dispute, as will be noted, but it is provided as background information for the material facts, which are not in dispute and which form the basis for my ruling, as is more fully described herein.

lance vehicle in the vicinity of 15 Sanford Drive. (*Id.*) Because the Officers[6] were undercover, none wore any clothing that would identify them as law enforcement officers. (D.I. 32, Ex. 1 at 2; D.I. 46 at ¶ 25.)

Defendants claim that Officers Armstrong and Freebery observed a vehicle pull up to Plaintiff's residence at approximately 8:25 to 8:30 p.m.[7] (D.I 32 at 5; D.I. 34 at 3.) The vehicle parked, and a white male, later identified as Adam Couden ("Adam"), got out of the vehicle, proceeded to the rear of Plaintiff's residence, and looked into several windows in the rear of the house. (*Id.*) Defendants state that Adam continued to peer into the windows while hiding behind objects in the back yard, and then attempted to open the rear sliding glass door, but could not gain entry. (D.I. 32 at 6; D.I. 34 at 3.) According to Defendants, Adam looked around to the left and right as if he was making sure no one could see him, and then quickly entered another rear door. (*Id.*) Defendants allege that once Adam entered the residence, the vehicle from which he exited pulled into Plaintiff's driveway.[8] (*Id.* at 4.) According to Defendants, this chain of events allegedly led Officers Armstrong and Freebery to conclude that they were witnessing a burglary in progress. (D.I. 32 at 6; D.I. 34, Ex. C.)[9]

Defendants assert that Officers Armstrong and Freebery attempted to communicate with Special Agent Duffey and Officer Sullivan on the WPD radio, but Special Agent Duffey and Officer Sullivan did not understand that Officers Armstrong and Freebery were calling for back up. (D.I. 32, Ex. 1 at 2; D.I. 34 at 4.) However, due to the excitement in the voices of Officers Armstrong and Freebery, Special Agent Duffey and Officer Sulilivan believed that there was a problem and drove over to where Officers Armstrong and Freebery had originally parked. (*Id.*) Before Special Agent Duffey or Officer Sullivan arrived, Officer Freebery went to the back of Plaintiff's residence to investigate. (D.I. 32 at 6–7; D.I. 34 at 4.) Officer Armstrong claims that he approached the vehicle that dropped off Adam, whom he suspected to be a burglar, and, with his badge in his extended left hand and with his weapon drawn at his right side, he identified himself as a police officer. (*Id.*)

Plaintiff explains this last event very differently. Plaintiff alleges that after she parked in her driveway, she noticed Officer Armstrong walking toward them with a gun in his hand. (D.I. 48 at 6.) She claims that he slowly approached the car, pointed the gun at her head, and started pulling on the handle of the door. (*Id.*) According to Plaintiff, Officer Armstrong

---

6. The term "Officers" refers to Special Agent Duffey and to Officers Armstrong, Freebery, and Sullivan.

7. Defendants say that the headlights were turned off, and Plaintiff alleges that the headlights of her vehicle were on. (D.I. 32, Ex. 1 at 2; D.I. 48 at 5.) Plaintiff claims that after returning from a skateboard store in Newark, where her son Adam's skateboard had just been assembled, she told Adam to put the skateboard in the garage and then to go around to the front door to ask her oldest child, Tiffany, if she wanted to go out to dinner with the family. (D.I. 48 at 5; D.I. 46

at ¶ 24.) Plaintiff claims that she pulled into the driveway and turned on her high beams to try to see what Adam was doing, because he was taking so much time getting Tiffany. (*Id.*) Since she could not see him, she claims she honked the horn twice. (*Id.*)

8. Defendants allege that the headlights were still turned off. (D.I. 32 at 4.)

9. Plaintiff claims that the Officers told her that they thought Adam was the fugitive whom the Task Force was looking for. (D.I. 48 at 10, Ex. C.)

did not say anything and did not present any identification. (*Id.*; D.I. 46 at ¶ 25.)

Terrified of Officer Armstrong, who Plaintiff did not know was a law enforcement officer, Plaintiff put the car into drive and stepped on the gas pedal "as hard as [she] could." (D.I. 48, Ex. C at ¶ 9.) She was headed straight for the garage, so she swerved and went through the side yard, where Officer Freebery was standing. (*Id.*; D.I. 32 at 7, D.I. 34 at 4.) In an attempt to stop the fleeing vehicle and protect himself, Officer Freebery threw his flashlight at the vehicle and shattered the passenger side window.[10] (*Id.*; D.I. 46 at ¶ 26; D.I. 51, Ex. 1 at ¶ 21.) However, Plaintiff did not stop. She continued through the side yard, went off the curb, and drove to her neighbors' house where she called the police. (D.I. 48 at 7; D.I. 34 at 4; D.I. 32 at 7.) Officers Freebery and Armstrong then went to the back of Plaintiff's residence and, according to Plaintiff, Tiffany Couden ("Tiffany") saw Officer Freebery

standing at the rear sliding-glass door with a gun in his hand. He was trying to open the door. When he saw Tiffany look at him, he quickly lifted his shirt to reveal what she thought must be a badge and demanded that Tiffany let him in. She was scared (and not fully dressed) because she was home alone and he had a gun. . . . The man never presented a warrant to her, and came in.[11]

(D.I. 48 at 7.) Plaintiff asserts that Officer Armstrong then came into the house, grabbed Tiffany, told her there was a robber in the house, and held her against her will. (*Id.*; D.I. 46 at ¶ 26.) Officers Armstrong and Freebery swept the house for the suspect, and, once Officer Armstrong discovered that Adam was in the garage, Adam was pulled into the house and pushed to the floor, a foot or knee was placed in his back, and he was handcuffed at gunpoint.[12] (D.I. 46 at ¶ 28.) According to Plaintiff, the Officers also maced or pepper sprayed Adam. (*Id.*; D.I. 48 at 8.) [13]

10. In the Complaint, Plaintiff states that it was the front windshield. (D.I. 46 at ¶ 26.) Plaintiff later states that it was the driver side window, and also the passenger side window. (D.I. 48 at 7, Ex. 1 at ¶ 21.) Special Agent Duffey states that it was the passenger side window. (D.I. 32, Ex. 1 at 4, *see also id.* at 7.) Regardless of which window was shattered, it is undisputed that neither Plaintiff nor any of the four children in the vehicle suffered serious physical injury. (D.I. 46 at ¶ 26.) Plaintiff had minor lacerations to her chin and arm and Luke Couden had a small laceration on his cheek from the broken glass. Nicholas Couden suffered a bruise on his arm as a result of the flashlight hitting him. (D.I. 32, Ex. 2–4, *Id.* at 7.)

11. Defendants state that Tiffany "allowed" them in. (D.I. 32 at 7; D.I. 34 at 4.)

12. In the Complaint, Plaintiff states that four Officers entered the house and that these Officers apprehended and handcuffed Adam (D.I. 46 at ¶¶ 27–28). However, Tiffany's sworn

affidavit clarifies the timing of when the Officers entered Plaintiff's residence. (D.I. 48, Ex. D.) She states that two Officers initially entered the house, and it is undisputed that these two Officers were Officers Armstrong and Freebery. (*Id.* at ¶¶ 5–6; D.I. 32 at 7; D.I. 34 at 4, Ex. 1.) Tiffany states that there were additional Officers present when Adam was apprehended and handcuffed. (D.I. 48, Ex. D at ¶¶ 7–15.) Defendants claim that Special Agent Duffey and Officer Sullivan did not arrive at Plaintiff's residence until after Adam had already been apprehended and handcuffed. (D.I. 32 at 5–6; D.I. 34 at 4.) Because the standard of review requires an examination of the facts in the light most favorable to Plaintiff, I assume that Special Agent Duffey and Officers Armstrong, Freebery, and Sullivan were present when Adam was being apprehended and handcuffed.

13. Defendants deny that Adam was maced and assert that none of the Officers carried mace on the night of the incident. (D.I. 32 at 8.)

When Tiffany went to see who the burglar was, she discovered that it was her brother Adam, and identified him to the Officers. Plaintiff alleges that the Officers asked for Adam's driver's license, and since he was fourteen and didn't have a driver's license, he offered his school identification, which was rejected. (D.I. 48 at 8.) According to Plaintiff, Tiffany then offered her driver's license and explained to the Officers that the woman in the car was their mom. (Id.) Plaintiff states that the Officers then walked out the front door, leaving Adam handcuffed. (Id.) Plaintiff alleges that after twenty minutes, they came back and un-handcuffed Adam. (Id. at 8.)[14] The Defendants assert that Adam was released after the Officers obtained his story, a story which involved Plaintiff dropping him off in a covert fashion so that he could spy on Tiffany and find out whether she was with her boyfriend doing "something bad." (D.I. 32 at 8; D.I. 34 at 4.)

When the Officers left the house, Tiffany and Adam walked out into the street, and Adam eventually found Plaintiff at a neighbor's house. (D.I. 48 at 9.) In response to Plaintiff's telephone call, a uniformed officer of the NCCPD arrived at the neighbor's house and Plaintiff informed the officer what had happened. (Id.) After investigating, the uniformed officer returned to the neighbor's house and informed Plaintiff that the people at her house were undercover law enforcement officers who had been conducting surveillance for a fugitive. (Id.) Shortly thereafter, Officers Armstrong and Freebery and Special Agent Duffey arrived at the neigh-

bors' house and explained to Plaintiff about the surveillance operation set up in her neighborhood. (Id. at 10.) After the Officers questioned Plaintiff and the four children seated in the backseat of the car at the time the flashlight broke the window, and after Officer Freebery retrieved his flashlight, the Officers left. (Id. at 11.) Plaintiff and her four younger children then went to the hospital and were treated for their injuries. (Id. at 12.)

Plaintiff brings claims against Special Agent Duffey and Officers Armstrong, Freebery, and Sullivan for deprivation of liberty without due process under the Fifth Amendment, violation of the right to bodily integrity under the Due Process Clause, and violation of the right to be free from unreasonable searches and seizures under the Fourth Amendment. (Id. at ¶¶ 36–38.) Plaintiff brings claims against Officers Armstrong, Freebery and Sullivan pursuant to 42 U.S.C. § 1983 for deprivation of the constitutional violations set forth above (Id. at ¶¶ 39–41), and against Special Agent Duffey and Officers Armstrong, Freebery, and Sullivan for negligent and intentional infliction of emotional distress, assault, battery, trespass, false imprisonment, false arrest and negligence.[15] (Id. at ¶¶ 36–41, 44–54.) Plaintiff brings suit against New Castle County, the NCCPD, the City of Wilmington, and the WPD, asserting that they are liable under 42 U.S.C § 1983 for negligent hiring, training, and supervising of their police officers and for implementing and executing customs and policies which allegedly caused the constitutional violations set forth above. (Id. at ¶¶ 42–43.) Plaintiff

---

**14.** Defendants dispute Plaintiff's contention that Adam was handcuffed for twenty minutes and claim it was closer to ten minutes. (D.I. 32 at 22; D.I. 51 at 5.)

**15.** Plaintiff also claims that Special Agent Duffey has violated "statutory rights," but

fails to specify any statutory rights that were violated. (D.I. 46 at ¶ 38.) As to Officers Armstrong, Freebery, and Sullivan, the only statute that Plaintiff claims the Officers violated is 42 U.S.C. § 1983. (D.I. 46 at ¶¶ 39–41.)

also brings suit against the United States pursuant to the Federal Tort Claims Act ("FTCA"). (*Id.* at ¶¶ 55–58.)

### III. Standard of Review

If in a motion to dismiss for failure to state a claim, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 ...." Fed. R.Civ.P. 12(b). In the present case, Defendants have offered numerous "matters outside the pleading" in support of their Motions, such as affidavits and explanations of what occurred on the night of April 12, 2001 that include additional facts. (*See* D.I. 32, 34, 46, 50.) Although the Defendants state that they are not relying on these extra-pleading materials, the Defendants have cited them in their challenge to the sufficiency of Plaintiff's claims, and "[t]he element that triggers the conversion [of a 12(b)(6) motion into a motion for summary judgment] is a challenge to the sufficiency of the pleader's claim supported by extra-pleading material." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 at 485 (2d ed.1990 and 2003 Supplement). *See also In re Rockefeller Center Properties, Inc. Securities Litigation,* 184 F.3d 280, 287 (3d Cir.1999) (quoting Wright & Miller). Accordingly, Defendants' Motions will be treated as motions for summary judgment under Rule 56.

After a motion to dismiss is converted into a motion for summary judgment, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R.Civ.P. 12(b). The Third Circuit has stated that "[t]he parties can take advantage of this [reasonable] opportunity only if they have 'notice of the conversion.'" *In re Rockefeller,* 184 F.3d at 287–288

(quoting *Rose v. Bartle,* 871 F.2d 331, 349 (3d Cir.1989)). In *Hilfirty v. Shipman,* 91 F.3d 573 (3d Cir.1996), the Third Circuit held that a plaintiff has adequate notice of the court's conversion of motions to dismiss into motions for summary judgment if the defendants' motions to dismiss are framed in the alternative as motions for summary judgment. *Id.* at 578–579. The court also held in *Hilfirty* that "'[w]]here a party has filed a motion for summary judgment, the opposing party is under an obligation to respond to that motion in a timely fashion and to place before the court all materials it wishes to have considered when the court rules on the motion.' ... That the two motions were framed only in the alternative as motions for summary judgment does not alter our conclusion" (citations omitted). *Id.*

As in *Hilfirty,* the Defendants' Motions here were framed in the alternative as summary judgment motions. That fact, and the fact that Plaintiff attached eight exhibits, including three affidavits, to her response to Defendants' Motions demonstrates that Plaintiff had adequate notice that Defendants' Motions could be treated as motions for summary judgment.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." "[T]he availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, the Court is required to accept the non-moving parties' evidence and draw

all inferences from the evidence in the non-moving parties' favor. *Id.* at 255, 106 S.Ct. 2505; *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002) (internal quotes omitted).

## IV. Discussion

### A. Plaintiff's Rule 56(f) Motion

Plaintiff claims that Defendants' Motions should be denied under Fed.R.Civ.P. 56(f) because she has not had an opportunity to take full discovery. (D.I. 48 at 28.) Rule 56(f) requires a party opposing a motion for summary judgment to file an affidavit and it gives a district court discretion to delay a motion for summary judgment "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition . . . ." Although "failure to support a Rule 56(f) motion by affidavit is not automatically fatal to its consideration," a party opposing summary judgment "must still identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1314 (3d Cir.1994) (quotations omitted). *See also Bradley v. U.S.,* 299 F.3d 197, 207 (3d Cir.2002) (quoting *St. Surin*). Here, Plaintiff has not filed an affidavit to support her Rule 56(f) Motion, nor has she identified what information she seeks, how it would help her case, or why it has not

been previously obtained. Far from presenting proof that she required discovery because she could not adequately defend against the Motions by filing affidavits, the Plaintiff in fact filed three affidavits and submitted a total of eight exhibits in opposition to the Defendants' Motions. Therefore, Plaintiff's 56(f) Motion will be denied.

### B. Qualified Immunity for Special Agent Duffey and Officers Armstrong, Freebery and Sullivan

Plaintiff's constitutional claims against Special Agent Duffey and Officers Armstrong, Freebery, and Sullivan are based on two events. The first occurred when Officers Armstrong and Freebery "searched" Plaintiff's yard "with guns drawn, looking for the lady in the get-away car," and attempted to seize Plaintiff's vehicle when Officer Armstrong "pointed [his] guns[ ] at them and grabbed the handle of the car door" and when Officer Freebery "using a flashlight, broke the car window with extreme force." (D.I. 48 at 18–21.) The second occurred when the Officers "came into the house and proceeded to search for Adam with guns drawn" and when the Officers "cuffed and manhandled" Adam. (*Id.*) Although not stated specifically in the Complaint, Plaintiff's claim appears to be that the Officers unlawfully searched her residence and used excessive force in the "seizure" of her and her children, thus violating their constitutional rights under the Fourth Amendment to be free of unreasonable search and seizures, as well as her rights under the due process clause of the Fifth and Fourteenth Amendments, and the substantive "liberty" guarantees of the due process clause of those latter two amendments.

Plaintiff's action against Special Agent Duffey is governed by the Supreme Court's decision in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91

S.Ct. 1999, 29 L.Ed.2d 619 (1971). In that case, the Court held that an individual complaining of a Fourth Amendment violation by federal officers acting under color of their authority may bring a suit for money damages against the federal officers in federal court. *Id.* at 397, 91 S.Ct. 1999.[16] Plaintiff brings this action against Officers Armstrong, Freebery, and Sullivan under 42 U.S.C. § 1983, which imposes civil liability upon any person who, under color of state law, deprives another person of any rights, privileges, or immunities secured by the Constitution or laws of the United States. Special Agent Duffey and Officers Armstrong and Freebery contend that they are entitled to qualified immunity and are therefore entitled to summary judgment on Plaintiff's constitutional, statutory, and common law tort claims against them. (D.I. 32 at 24–29; D.I. 34 at 13–16.) Qualified immunity insulates government officials performing discretionary functions "from liability for civil damages in so far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In either a *Bivens* action or a Section 1983 action, "it is clear that claims of qualified immunity are to be evaluated using a two-step process. First, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir.2002) (citing *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272

(2001)). If the plaintiff has raised a constitutional violation, the second step is to determine whether the constitutional right was clearly established. *Id.* The question then becomes whether, "in the factual scenario established by the plaintiff, ... a reasonable officer [would] have understood that his actions were prohibited[.]" *Id.* As a matter of law, "[i]f it would not have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity." *Id.* at 136–37 (emphasis in original). The process of determining whether federal and state officials are entitled to qualified immunity also applies to violations of statutory rights. *See S.G. v. Sayreville Board of Education*, 333 F.3d 417, 420 (3d Cir.2003) (stating that the first step in determining whether an individual defendant is entitled to qualified immunity is "to assess whether the plaintiff's allegations are sufficient to establish the violation of a constitutional or statutory right"). I will therefore proceed to first consider whether Plaintiff has alleged facts sufficient to establish the violation of constitutional or statutory rights. If so, I will then consider whether the right allegedly violated was "clearly established," or whether the Officers should have known their actions were prohibited in this situation.

1. **Constitutional and statutory claims against Special Agent Duffey and Officers Armstrong, Freebery, and Sullivan**

a. **Search of Plaintiff's Residence**

■ "A search warrant, supported by probable cause, is normally necessary before law enforcement may lawfully search a person's property." *United States v. Burton*, 288 F.3d 91, 102 (3d Cir.2002).

---

**16.** The Court's holding in *Bivens* has been subsequently broadened to include violations of other provisions of the Constitution that

guarantee individual rights. *See Shreiber v. Mastrogiovanni*, 214 F.3d 148, 151–152 (3d Cir.2000).

Searches of a home without a warrant are presumptively unreasonable under the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Exigent circumstances is another justification for a warrantless entry into the home, when those "making the search ... have reason to believe that life or limb is in immediate jeopardy and [when] the intrusion is reasonably necessary to alleviate the threat." *Good v. Dauphin County Social Servs. for Children & Youth*, 891 F.2d 1087, 1094 (3d Cir.1989).

■ Here, the undisputed facts show that Officers Armstrong and Freebery were in front of Plaintiff's residence on a stake out of a potentially dangerous fugitive. By Plaintiff's account, Officers Armstrong and Freebery mistook Adam for the fugitive, and there is no dispute that Adam approached the house from the rear and looked in the rear windows before entering the house. Based on these undisputed facts, Officers Armstrong and Freebery believed that there was "an immediate threat to anyone inside the residence" (D.I. 32 at 11) and acted reasonably by approaching Plaintiff's residence to investigate. Although Plaintiff does not characterize Tiffany's action of letting Officers Armstrong and Freebery in the home as consent, Plaintiff does not deny that Officers Freebery and Armstrong obtained Tiffany's consent before entering the residence.[17] (D.I. 48 at 7.) The search of Plaintiff's residence was therefore both consensual and justified by exigent circumstances. Accordingly, no warrant was required and the Plaintiff has not established that any of the Officers' actions violated her constitutional rights in this regard.[18]

### b. Seizure of Plaintiff and her children

■ Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause. *Katz v. United States*, 389 U.S. 347, 356–57, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). But under the "narrowly drawn authority" of *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an officer without a warrant "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 23, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). The undisputed facts in this case are enough to establish that Officers Armstrong and Freebery had reasonable suspicion of criminal activity. As mentioned, the Officers were conducting surveillance near Plaintiff's residence at nighttime to

---

17. Tiffany says that she was fearful when she let Officer Freebery in the home, but acknowledges that she knew he was a law enforcement officer and let him in. (D.I. 48, Ex. D at ¶ 4.)

18. 'As mentioned previously, although it is undisputed that Officers Armstrong and Freebery entered Plaintiff's house before Special Agent Duffey and Officer Sullivan, whether Special Agent Duffey and Officer Sullivan searched the home in order to apprehend Adam is disputed. Because the search was clearly consensual and justified as to Officers Armstrong and Freebery, and because there is no evidence indicating that the consent given did not cover Special Agent Duffey and Officer Sullivan or that the exigent circumstances had evaporated before their entry, the search was also consensual and justified as to Special Agent Duffey and Officer Sullivan, if those Officers in fact participated in the search and seizure.

apprehend a fugitive, and it is undisputed that Officers Armstrong and Freebery witnessed Adam approach the house from the rear, and peek into the rear windows of the house. It is also undisputed that Adam could not gain entry after opening the rear sliding glass door, and that he entered another rear door after looking around to the left and right as if he was making sure no one could see him. Plaintiff alleges that the Officers thought that Adam was the fugitive (D.I. 48 at 10, Ex. C), and this, coupled with Adam's suspicious behavior, was sufficient to give the Officers reasonable suspicion of criminal activity. Thus, the investigatory stop or seizure of the vehicle and the detaining of Adam was reasonable under the Fourth Amendment.[19] Plaintiff has not shown a violation of her or her children's constitutional rights in this respect either.

#### c. Excessive Force

The next question is whether the Officers used excessive force during the stop or seizure of either the vehicle or of Tiffany, or during the detention of Adam, and thereby violated Plaintiff's constitutional rights. In *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that "all claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Therefore, I will analyze Plaintiff's "seizure" claims under the reasonableness standard of the Fourth Amendment, not under the due process guarantees of the Fifth and Fourteenth Amendments.

■ In order to prevail on a Fourth Amendment excessive force claim, a plain-

tiff must demonstrate that the defendant's use of force was not "objectively reasonable." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865 (1989). Proper application of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. Other important factors include whether "the physical force [the officers] applied was of such an extent as to lead to injury," the possibility that the persons subject to the police action are armed and dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir.1997). When balancing these factors, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather then with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

■ The first factor in analyzing the objective reasonableness of the Officers' use of force is to examine the severity of the crime at issue. Although it turns out that no crime was being committed by Plaintiff, or any of her children, Plaintiff

---

**19.** Special Agent Duffey and Officer Sullivan could not have violated Plaintiff's rights pursuant to an unlawful stop or seizure of the vehicle under the Fourth Amendment because it is undisputed that they were not present during this incident.

states that Officers Armstrong and Freebery concluded that they were witnessing the activities of a fugitive at large. (D.I. 48 at 10, Ex. C.) Therefore, even assuming Plaintiff is correct about those Officers' mind set, because fugitives are potentially armed and dangerous, it was reasonable for them to believe that there was an immediate threat to the safety of themselves and to anyone inside or in the vicinity of the residence. Accordingly, when approaching the vehicle, which Officers Armstrong and Freebery saw Adam get out of, the decision to have their guns drawn did not constitute excessive force. Nor did throwing a flashlight at the fleeing vehicle. Here, Plaintiff was actively resisting the stop or seizure when the flashlight was thrown. She was driving her car erratically, and, at one point, she was apparently driving directly at Officer Freebery. (D.I. 51, Ex. 1 at ¶ 21.) It was therefore not unreasonable for Officer Freebery to throw a flashlight in his effort both to protect himself and to impede the Plaintiff's flight. Moreover, nobody in the vehicle suffered serious physical injuries as a result of Officer Freebery's action. These factors persuade me that, even when the facts are viewed in the light most favorable to Plaintiff, excessive force was not used in the attempted stop of the vehicle.

Similarly, the Officers' entering the residence with guns drawn did not constitute excessive use of force, nor did their grabbing Tiffany, nor did their handcuffing Adam at gunpoint and macing or pepper spraying him, if that happened. The need to provide for the safety of Tiffany, themselves, and any other persons who may have been in the house justified the Officers' actions. Even if Adam was detained for twenty minutes, as Plaintiff alleges, this would not constitute excessive force because such a period of time would be reasonable for the Officers to protect the occupants of the house or themselves while investigating the circumstances at hand. See Torres v. United States, 200 F.3d 179, 186 (3d Cir.1999). Because the Officers' use of force in stopping the vehicle, grabbing Tiffany, or detaining and subduing Adam, was not unreasonable, the Officers did not violate the Plaintiff's or her children's constitutional rights. The Officers are therefore entitled to qualified immunity and the Officers' Motions[20] with respect to Plaintiff's constitutional and statutory claims[21] will be granted.[22]

### 2. Common law tort claims against Special Agent Duffey and Officers Armstrong, Freebery and Sullivan

In Plaintiff's response (D.I. 48 at 24), she argues that Special Agent Duffey's

---

20. As noted earlier, Officer Sullivan has not filed any dispositive motions. For reasons that will be discussed, summary judgment for Officer Sullivan on Plaintiff's constitutional and statutory claims will be granted *sua sponte*.

21. Plaintiff never articulated any statutory claims against the Officers, except for § 1983 (D.I. 46 at ¶¶ 39–41), which does not provide any rights in and of itself but is simply the vehicle for asserting constitutional rights against those acting under color of state law. *Baker v. McCollan*, 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (42 U.S.C. § 1983 "is not itself a source of substantive rights, but a method for vindicating federal

rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.")

22. "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the *initial burden* of showing that the defendant's conduct violated some clearly established statutory or constitutional right" (emphasis in the original). *Donahue v. Gavin*, 280 F.3d 371, 378 (3d Cir.2002) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997)). Since Plaintiff has not carried her burden of establishing any statutory or constitutional violations, the Officers are entitled to qualified immunity.

claim of immunity from her common law claims of negligent infliction of emotional distress, intentional infliction of emotional distress, assault, battery, false imprisonment, false arrest, trespass, and wanton negligence raises "mixed questions of fact and law," and therefore "it is improper to apply the law to the disputed facts about the officer's conduct." (*Id.*) Section 1912 of Title 11 of the Delaware Code states:

A sworn federal law-enforcement officer, who in an official capacity is authorized by law to make arrests, shall have the same legal status and immunity from suit in this State as a member of the Delaware State Police when making an arrest in this State concerning a nonfederal crime, only if:

(1) The federal officer reasonably believes that the person arrested has committed or is committing a felony in the officer's presence; or

(2) The federal officer is rendering assistance to a peace officer of this State in an emergency or at the request of the peace officer.

11 *Del. C.* § 1912. The undisputed facts establish that Officers Armstrong and Freebery witnessed Adam approach Plaintiff's residence, and according to Plaintiff, they concluded that Adam was the fugitive. It is undisputed that Officers Armstrong and Freebery then called Special Agent Duffey and Officer Sullivan for back up, and approached the residence and entered the house upon receiving Tiffany's consent. What is disputed is when Special Agent Duffey and Officer Sullivan arrived. Plaintiff claims that it was before Adam was arrested and Defendants claim that it was after Adam was arrested. Even if it was before Adam was arrested, as Plaintiff alleges, the undisputed facts show that Special Agent Duffey responded to a call for back up and was rendering assistance to Officers Armstrong and Freebery during Adam's detention. Therefore, under the second prong of 11 *Del. C.* § 1912, Special Agent Duffey is immune from Plaintiff's state common law tort claims.

█ With respect to the state common law tort claims against Officers Armstrong, Freebery, and Sullivan, Plaintiff alleges that they may be sued in their individual capacity under the Delaware Tort Claims Act. (D.I. 46 at ¶ 45.) That Act provides, in pertinent part:

An employee may be personally liable for acts or omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent.

10 *Del. C.* § 4011(c). Since this statute makes government officials personally liable "only for those acts which were not within the scope of [their] employment," and Plaintiff never alleges that Officers Armstrong, Freebery, and Sullivan were not acting within the scope of their employment, Officers Armstrong, Freebery, and Sullivan are immune from liability to Plaintiff under this section of the Delaware Tort Claims Act. Accordingly, the Officers' Motions with respect to Plaintiff's common law tort claims will be granted.

C. Section 1983 claim against New Castle County, the NCCPD, the City of Wilmington, and the WPD

█ In *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) the Supreme Court held that a municipality cannot be held liable solely under the theory of *respondeat superior*. "Instead, it is when the execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983."

*Id.* at 694, 98 S.Ct. 2018. Therefore, under *Monell,* New Castle County, the NCCPD, the City of Wilmington, and the WPD must have caused the violation of Plaintiff's constitutional rights for liability to attach to these municipal entities under § 1983. *See also Fagan v. City of Vineland,* 22 F.3d 1283, 1291 (3d Cir.1994) ("[a] municipality can be sued directly under section 1983 where action pursuant to a municipal policy or custom causes the constitutional tort").

■ Plaintiff's argument is that New Castle County, the NCCPD, the City of Wilmington, and the WPD are liable pursuant to 42 U.S.C. § 1983 for "negligently hiring, training and supervising ... police off[ic]ers, and by implementing and executing governmental customs and official policies which have caused the constitutional violations and damages" alleged. (D.I. 46 at ¶ 43.) As discussed above, however, Special Agent Duffey, and Officers Armstrong, Freebery and Sullivan did not commit any constitutional violations against Plaintiff or her children. Because the Officers did not commit any constitutional violations, it follows that the municipalities are not liable for policies or training or supervising that led to non-existent violations. Accordingly, New Castle County and the NCCPD are not liable to Plaintiff under section 1983 and their Motions will be granted.

■ Officer Sullivan, the City of Wilmington, and the WPD have not filed dispositive motions in response to Plaintiff's Complaint. However, it has long been established that, under certain circumstances, district courts are entitled to enter summary judgment *sua sponte. See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). From a procedural standpoint, Fed. R.Civ.P. 56(c) requires that the parties be given notice that a motion for summary judgment is being considered, and this notice requirement applies to *sua sponte* grants of summary judgment. *See Otis Elevator Co. v. George Washington Hotel Corp.,* 27 F.3d 903, 910 (3d Cir.1994) ("[A] district court may not grant summary judgment *sua sponte* unless the court gives notice and an opportunity to oppose summary judgment"). Exceptions to this notice requirement include "the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue." *Gibson v. Mayor and Council of the City of Wilmington,* 355 F.3d 215 (3d Cir.2004) (stating that the court "need not decide if fewer than all three [of these exceptions] would suffice" to constitute proper notice).

Here, all three exceptions have been met. The Defendants filed motions for summary judgment and Plaintiff was "afforded an adequate opportunity to develop the record," and she did in fact develop the record. *Id.* (quoting *Artistic Entertainment, Inc. v. City of Warner Robins,* 331 F.3d 1196, 1202 (11th Cir.2003)). Plaintiff responded to Defendants' Motions jointly, supplementing her version of the facts and her legal arguments with eight exhibits, including three affidavits. (D.I.48.) Moreover, because Plaintiff had notice that the motions for summary judgment filed by the three Officers, New Castle County, and the NCCPD were under consideration, and because Plaintiff has not contended, and could not credibly contend, that the record and arguments with respect to Officer Sullivan and, by extrapolation, to the City and the WPD, have not already been laid out in addressing the case dispositive motions that are now at issue, Plaintiff is not prejudiced by *sua sponte* summary judgment for the City of Wilmington, the WPD, and Officer Sullivan. Finally, the decision to grant summary judgment to the City of Wilmington, the WPD, and

Officer Sullivan is based on a purely legal issue. Taking the Plaintiff's version of the facts as true, neither Officer Sullivan nor the other Officers violated any of Plaintiff's constitutional rights, and it therefore follows that the City of Wilmington and the WPD did not negligently train or supervise Officer Sullivan in a way that caused any violation of Plaintiff's constitutional rights, nor did they institute policies leading to any violation. Accordingly, summary judgment will be granted for the City of Wilmington, the WPD, and Officer Sullivan.

### D. Tort Claims against the United States

 Plaintiff brings suit against the United States pursuant to the FTCA for the actions of Special Agent Duffey. (D.I. 46 at ¶¶ 55–56.) The United States has filed a motion to dismiss.[23] (D.I.64.) Liability against the United States under the FTCA arises only if the conduct of the employee violated state or federal law. *Deary v. Three Un–Named Police Officers,* 746 F.2d 185, 189 n. 2 (3d Cir.1984). As discussed, Special Agent Duffey's conduct did not violate any laws.[24] Therefore, the United States is not liable to Plaintiff pursuant to the FTCA, and summary judgment will be granted for the United States.

### V. Conclusion

For the reasons set forth herein, the motion filed by Special Agent Duffey

(D.I.32) will be granted, the motion filed by Officer Armstrong, Officer Freebery, New Castle County, and the NCCPD (D.I.34) will be granted, the motion filed by the United States (D.I.64) will be granted. In addition, summary judgment will be granted for the City of Wilmington, the WPD, and Officer Sullivan. Plaintiff's Rule 56(f) Motion (D.I.48) will be denied. An appropriate order will issue.

### *ORDER*

For the reasons set forth in the Memorandum Opinion issued on this date,

IT IS HEREBY ORDERED that Plaintiff's Rule 56(f) Motion (D.I.48) is DENIED, the motion for summary judgment filed by Special Agent Duffey (D.I.32) is GRANTED, the motion for summary judgment filed by Officer Armstrong, Officer Freebery, New Castle County, and the NCCPD (D.I.34) is GRANTED, and the motion filed by the United States (D.I.64) is GRANTED. It is further ordered that summary judgment shall be entered for the City of Wilmington, the WPD, Officer Sullivan, and the "two unknown named agents" of the Federal Bureau of Investigation.

**23.** Because the motion to dismiss filed by the United States is dependent upon the extra-pleading materials submitted in this matter, it too is treated as a motion for summary judgment.

**24.** As previously discussed, Plaintiff has listed as defendants "two unknown named agents" of the FBI in her lawsuit, claiming that they violated the same constitutional and statutory rights as the other Officers. (D.I. 46 at ¶ 56.) However, she has produced no evidence indicating that any law enforcement officer other than those identified by name participated in the events underlying this suit. Even if there were other FBI agents involved in this incident, however, Plaintiff has not alleged that they were involved in the events in any different manner than the ways in which the named Officers were involved. Accordingly, any such agents and the United States are not liable.